IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DEBORAH GRINNAGE-PULLEY,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-18-899 |
| **BOARD OF EDUCATION OF CALVERT COUNTY,** | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

Plaintiff Deborah Grinnage-Pulley ("Ms. Grinnage-Pulley") filed this case against her former employer, the Board of Education of Calvert County ("Defendant"), alleging race and gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ("Title VII"); and age discrimination under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623 (the "ADEA"). On April 22, 2019, Defendant filed a Motion for Summary Judgment, ECF 25, along with a memorandum of law, ECF 25-1 (collectively, the "Motion"). Ms. Grinnage-Pulley opposed the Motion, ECF 26 ("Opposition"), and Defendant replied, ECF 27 ("Reply"). I find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant the Motion and enter judgment in favor of Defendant.

I. **FACTUAL BACKGROUND**

The facts below are taken in the light most favorable to Ms. Grinnage-Pulley, the non-moving party. In 1975, Defendant hired Ms. Grinnage-Pulley, an African-American female, to teach in the Calvert County Public Schools ("CCPS"). ECF 26-2 at 38:17, 76:15-16. In her more than thirty-five years of service, Ms. Grinnage-Pulley received numerous promotions,

serving as a school principal and then, eventually, as Executive Director of School Operations. *Id.* at 38:14-21, 39:13-16; ECF 26-5 at 12:1-10. Ms. Grinnage-Pulley served in that capacity, as a member of the Executive Team reporting directly to former Superintendent Dr. Jack Smith, from 2006-2013. ECF 26-2 at 39:16-40:9. As Executive Director of School Operations, Ms. Grinnage-Pulley supervised the principals of CCPS's schools, worked with the Department of Transportation, and supervised the Office of Information and Technology. *Id.* at 41:6-21. To perform those tasks, Ms. Grinnage-Pulley traveled to schools throughout Calvert County to make school visits. *Id.* at 48:1-17. During her long tenure at CCPS, she consistently received superior performance evaluations. ECF 26-4.

On July 1, 2013, Nancy Highsmith became Interim Superintendent of CCPS. ECF 26-2 at 61:16-21; ECF 25-6 at 6. At that time, the existing Executive Team consisted of Ms. Grinnage-Pulley, Kimberly Roof (the Executive Director of Administration), Robin Welsh (the Deputy Superintendent), and Tammy McCourt (the Chief Budget and Business Officer). ECF 25-6 at 6; ECF 25-14 at 77:18-78:2. As Interim Superintendent, Ms. Highsmith supervised Ms. Grinnage-Pulley, along with the rest of the Executive Team reporting to the Superintendent. *See* ECF 25-8. Before July 1, 2013, Ms. Grinnage-Pulley had supervised Ms. Highsmith. Exh. 26-5 at 13:9-21, 14:5-7. Ms. Highsmith described the situation when she became Interim Superintendent as "strange," because they had reversed supervisory roles. ECF 26-5 at 14:15-15:5. She specifically recounted a meeting after which she wanted to meet with an employee who was a personal friend, and Ms. Grinnage-Pulley expressed the view that she was "highly insulted . . . that [Ms. Highsmith] would dismiss her in front of a subordinate." ECF 26-5 at 15:9-19.

Ms. Highsmith also contends that she believed the members of the Executive Team excluded her from daily closed-door meetings upon her arrival as Interim Superintendent. ECF 26-5 at 16:10-17:21, 28:1-2. Ms. Roof and Ms. Welsh deny excluding Ms. Highsmith from any work-related meetings. ECF 26-6 at 56:16-57:15; ECF 26-7 ¶¶ 9-10. Approximately one week after assuming the position of Interim Superintendent, in July, 2013, Ms. Highsmith informed the existing Executive Team that she intended to reorganize CCPS's leadership structure, and that their jobs would be changed. ECF 26-2 at 80:10-21; *see also* ECF 26-6 at 44:13-20 (Roof testimony that "[S]he let us know in July she was going to be making some changes."). On August 30, 2013, Ms. Highsmith and the President of the Board of Education, Dr. Eugene Karol, informed Ms. Grinnage-Pulley, Ms. Roof, and Ms. Welsh that they would be transferred from the Executive Team to other, lower-paying positions within CCPS. ECF 26-7 ¶ 12; ECF 26-2 at 80:1; ECF 26-6 at 44:13-20. Ms. McCourt, who served as Chief Budget and Business Officer, remained in that position, although she no longer reported directly to the Interim Superintendent. ECF 26-7 ¶¶ 6, 12; ECF 25-8; ECF 25-9. Ms. Roof had served as both Executive Director of Administration and Director of Student Services under Dr. Smith, so she remained as Director of Student Services, in the same CCPS building, following her removal from the Executive Team. ECF 26-6 at 8:8-15, 33:13-20, 36:10-37:1. Ms. Highsmith transferred Ms. Welsh, who has an extensive background in special education, from the Executive Team to be Principal at Calvert Country School, a special education school located across the street from the CCPS building. ECF 26-6 at 43:4-12; ECF 26-5 at 73:5-16. Citing Ms. Grinnage-Pulley's prior success as a middle school principal, Ms. Highsmith transferred her to be Principal at Mill Creek Middle School, located approximately 19 miles from the CCPS building. ECF 26-5 at 40:15-41:1; 56:3-6; 120:17-121:4; 182:5-7. Due to their transfers from the Executive Team to school principal

3

positions, Ms. Grinnage-Pulley and Ms. Welsh would continue to receive their existing salaries for the 2013-2014 school year, but would be placed on the lower salary scale for school-level administrators beginning in the 2014-2015 school year. ECF 26-7 ¶ 13; ECF 26-5 at 126:18-127:8.

In reorganizing the leadership structure, Ms. Highsmith replaced the four Executive Team positions with two Assistant Superintendents, Diane Workman and Anthony Navarro. ECF 25-9. Twelve Directors (including the Chief Budget and Business Officer) reported to the Assistant Superintendents. *Id.* Ms. Highsmith newly created one of the twelve Director positions, Director of Instruction, and she appointed Scott McComb to serve as Acting Director of Instruction to begin the 2013-2014 school year. ECF 26-5 at 39:20-40:4, 55:18-56:2. At the time of his appointment, Mr. McComb was approximately 20 years younger than Ms. Grinnage-Pulley, and did not meet the certification requirement for a director-level position. ECF 26-2 at 94:1-5; ECF 26-5 at 122:9-17; ECF 26-3 at 53:9-12. Ms. Highsmith concedes that Mr. McComb was not the most qualified candidate at the time of his appointment to the acting position, but she selected him, "Because I had worked with him for many years and I trusted him. And he was good for the school system." ECF 26-5 at 74:6-13. Ms. Highsmith exercised her authority to appoint Mr. McComb in an acting capacity, ECF 26-5 at 73:17-75:6, and then sought applications to fill the permanent Director of Instruction position in March, 2014. ECF 26-5 at 107:15-108:12, 125:19-126:1. Ms. Grinnage-Pulley did not apply for the position when it was posted. ECF 27-1 at 98:11-20.

Following Mr. McComb's appointment to the position of Acting Director of Instruction, and her transfer to the position of Principal of Mill Creek Middle School, Ms. Grinnage-Pulley retired from CCPS on October 1, 2013. ECF 26-2 at 39:8-12.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant, as the moving party, bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282,1286 (4th Cir. 1987)). If Defendants establish that there is no evidence to support Plaintiff's case, the burden then shifts to Plaintiff to proffer specific facts to show a genuine issue exists for trial. *Id.* Plaintiff must provide enough admissible evidence to "carry the burden of proof in [her] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for Plaintiff. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)). Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. Plaintiff "must produce competent evidence on each element of his or her claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If Plaintiff fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010 (unpublished)). In ruling on a motion for summary judgment, a court must view all of the

facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  ANALYSIS

Ms. Grinnage-Pulley's Complaint and Opposition to the Motion suggest two separate legal claims: 1) a failure to hire her for the newly created position of Acting Director of Instruction; and 2) a discrimination claim based on Ms. Grinnage-Pulley's reassignment to be Principal of Mill Creek Middle School, which she contends constituted constructive discharge. Ms. Grinnage-Pulley argues that both of those alleged discriminatory acts were premised on her race, gender, and age.

As to both claims, Ms. Grinnage-Pulley offers "no direct evidence of discrimination," ECF 26 at 12, and seeks to proceed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] Under that analysis, Ms. Grinnage-Pulley must first establish a *prima facie* case of discrimination. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The burden of establishing a *prima facie* case is "not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If Ms. Grinnage-Pulley sustains that burden, Defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. *See id.* at 253-54. The burden then shifts back to Ms. Grinnage-Pulley, who must establish that the proffered reason is pretextual. *See id.* Pretext is established

---

[1] *McDonnell Douglas* involved a claim of racial discrimination in violation of Title VII. 411 U.S. at 793-94. The Fourth Circuit has used the *McDonnell Douglas* framework for cases involving ADEA age discrimination claims. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006); *but see Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 n.2 (2009) (stating that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas . . .* utilized in Title VII cases is appropriate in the ADEA context").

6

where there is "sufficient evidence to find that the employer's asserted justification is false" or "unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000). "The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253; *Hughes v. Bedsole*, 48 F.3d 1376, 1384 (4th Cir. 1995)).

### A. Failure to Hire

Ms. Grinnage-Pulley's self-described "main argument" is "that the failure to hire her for the Director of Instruction position constitutes an adverse employment action." ECF 26 at 15. "[I]n order to prove a prima facie case of discriminatory failure to hire or promote under Title VII, a plaintiff must prove that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998); *see also Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 274 (4th Cir. 1995) (listing similar elements for a *prima facie* case of failure to hire under the ADEA). While no party disputes that Ms. Grinnage-Pulley is a member of multiple protected groups, and was qualified to serve as Director of Instruction, Defendant contests her ability to prove the second and fourth elements of her claim.

To determine whether Ms. Grinnage-Pulley satisfied the second element, requiring her to apply for the position in question, a distinction must be drawn between the Director of Instruction position, which was posted in March, 2014, and the Acting Director of Instruction position awarded to Mr. McComb in August, 2013. As to the former, Ms. Grinnage-Pulley did not apply for the permanent position when it was posted, and therefore is barred from

establishing a *prima facie* case of failure to hire her for that post. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) ("If an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote."). However, Ms. Grinnage-Pulley is arguably exempt from the application requirement as to the Acting Director of Instruction position, because applications were not sought for the newly created position, and the position was never posted. *See id.* at 431 ("On the other hand, if the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position."). Thus, as to the acting position, the second element will be deemed satisfied.

Although Defendant contests Ms. Grinnage-Pulley's ability to show the fourth element of the *prima facie* case, requiring "circumstances giving rise to an inference of unlawful discrimination," given the fact that the burden to establish a *prima facie* case is not onerous, the evidence is best addressed in the context of Ms. Grinnage-Pulley's ability to prove pretext. Defendant has asserted a legitimate non-discriminatory reason for its hiring of Mr. McComb to be Acting Director of Instruction: Ms. Highsmith was restructuring the front office, and replacing existing employees she did not trust with her own team of trusted individuals. Her selection of Mr. McComb, someone she had worked with for years and trusted, is consistent with that explanation.

Ms. Grinnage-Pulley argues that proffered rationale for selecting Mr. McComb was pretext for discrimination. "In order to succeed at this stage, the plaintiff must 'show both that the reason advanced was a sham *and* that the true reason was an impermissible one under the law.'" *Ousley v. McDonald*, 648 F. App'x 346, 349 (4th Cir. 2016) (unpublished) (quoting

8

*Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995)). She contends, and Defendant does not dispute, that she was far more qualified than Mr. McComb for the position. ECF 26 at 20-22. In the circumstances of this case, however, Ms. Grinnage-Pulley's superior qualifications do not suggest pretext for discrimination on the basis of any protected class. Regarding the issue of qualifications and job performance, Ms. Highsmith did not purport to hire the most qualified individual for the job, but simply filled the leadership post with a long-time colleague she trusted. An employer is not required to make the most fair hiring decision or to promote the best possible candidate, so long as the basis for hiring or promotion is not unlawfully discriminatory. "When evaluating pretext, it is not within [the Court's] purview to question whether the employer's proffered basis for the disputed action 'was wise, fair, or even correct, ultimately, so long as it truly was the reason for' the action." *Ousley,* 648 F. App'x at 349 (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013)). Also, there is no requirement that a defendant's nondiscriminatory reason for making a hiring decision be objectively measurable. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion . . . yet they are essential to an individual's success in a supervisory or professional position.") (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991, 999 (1988)); *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989) ("Subjective criteria necessarily and legitimately enter into personnel decisions involving supervisory positions."); *EEOC v. Delta Chem. Corp.*, Civil No. JFM 07-2572, 2008 WL 4833098, at *4-5 (D. Md. Nov. 3, 2008) ("An employer may base its hiring decisions on its subjective impressions of a candidate's personal qualities so long as the employer 'articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.' Defendant-employers have failed to meet this

burden only when they have given *no* explanation for their negative evaluation of a candidate.") (quoting *Chapman*, 229 F.3d at 1034; citing *EEOC v. Target Corp.*, 460 F.3d 946, 958 (7th Cir. 2006); *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004)).

Ms. Grinnage-Pulley has not presented evidence reasonably undermining the veracity of Defendant's proffered reason: her mistrust of the existing Executive Team and her preference to reorganize the leadership structure to install co-workers she trusted. The evidence, both from Ms. Highsmith as described above and from other employees, corroborates that the personal interactions between Ms. Highsmith and the members of the existing Executive Team were strained upon her arrival. ECF 26-3 at 47-49 (Hutchins testimony describing the reason for Ms. Grinnage-Pulley's reassignment as "vindictiveness" over the change in supervisory roles, and describing the overall work environment in July 2013 as "tense, very tense"); ECF 26-6 at 49-50 (Roof testimony stating that she did not believe that Ms. Highsmith "was prepared to be a Superintendent" or understood "a lot of the nuances of the job," and stating "when we would try to work with her and help her and advise her it came across to me as she was irritated or frustrated or maybe a little angry."). Ms. Grinnage-Pulley contends, citing testimony from the other members of the Executive Team, that any meetings behind closed doors were for personal or confidentiality reasons rather than an attempt to exclude Ms. Highsmith from significant discussions. ECF 26-6 at 56:12-57:15; ECF 26-7 ¶ 9. However, this Court's role is not to decide if Ms. Highsmith's suspicions were correct. Rather, the issue for the Court is whether Ms. Highsmith's purported reason for the staffing changes was the actual reason she made those changes. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). Given the strained relationships among the existing leadership staff, Defendant has articulated a clear and reasonably specific factual basis for Ms. Highsmith's growing distrust of the Executive Team she

inherited, and the evidence Ms. Grinnage-Pulley cites does not suggest that Ms. Highsmith's rationale is disingenuous. *See Hux v. City of Newport News*, 451 F.3d 311, 318 (4th Cir. 2006) ("It is not within our authority to dictate the factors that employers must weigh in making a promotion, and we see nothing in Title VII to indicate that Congress wished to require companies to disregard the successful personal interactions that make for a productive workplace."). Because Ms. Highsmith had extensive work experience working alongside Mr. McComb, her selection to elevate him to a position of leadership in her new administration, while subjective in nature, rests on a sufficient factual basis to be nondiscriminatory.

Ms. Grinnage-Pulley cites *Vaughan v. Metrahealth Companies, Inc.*, 145 F. 3d 197, 201 (4th Cir. 1998), for the proposition that a "deviation from normal business practices can also illustrate pretext." ECF 26 at 20. However, in *Vaughan*, the employer claimed the decision to fire the employee was a result of the normal business practices, as embodied in a "Downsizing Manual." 145 F.3d at 200-201. Therefore, deviation from those normal business practices directly undermined the employer's purported justification. *Id.* Here, Ms. Hightower's decision to appoint Mr. McComb as Acting Director of Instruction without going through the usual hiring process does nothing to undermine her purported reason for appointing him to the position. Therefore, Ms. Hightower's "deviation from normal business practices" does not support Ms. Grinnage-Pulley's claims of pretext.

Moreover, Ms. Highsmith's decision to appoint Mr. McComb has to be viewed in the context of the overall restructuring of her leadership team, in order to assess whether or not her actions constituted mere pretext for discrimination. Ms. Grinnage-Pulley's focus solely on Mr. McComb as the relevant comparator is unwarranted, given the fact that the closest replacements to her own position, in terms of job duties, were those of the two Assistant Superintendents

comprising the new Executive Team. The record does not clearly reflect the demographic characteristics of the two people chosen for those positions, Diane Workman and Anthony Navarro, other than evidence that they are Caucasian. ECF 26-7 ¶ 14. Further, the record does not reflect the professional qualifications of Ms. Workman, Mr. Navarro, or any other candidates selected for promotion in Ms. Highsmith's restructuring. The "statistical" argument advanced by Ms. Grinnage-Pulley, relating to the number of African-Americans in Ms. Highsmith's leadership positions as compared to the prior administration, is unpersuasive in light of the somewhat contradictory evidence regarding promotion of African-Americans, and the limited utility of statistics in evaluating a particular incidence of failure to hire. *See Diamond v. Bea Maurer, Inc.*, 128 F. App'x 968, 971 (4th Cir. 2005) ("Under Fourth Circuit precedent, a dearth of African-American employees, without evidence as to the number of qualified African-Americans in the 'relevant labor pool,' does not establish even a circumstantial '*prima facie* case of discrimination,' let alone direct or indirect evidence of purposeful discrimination.") (unpublished) (citing *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994)); *compare* ECF 26-7 ¶ 24 (suggesting that, during Ms. Highsmith's tenure, the number of African-Americans in "leadership positions" was reduced from seventeen to eleven) *with* ECF 26-5 at 85:5-21 (noting that upon arrival as Interim Superintendent, Ms. Highsmith had one African-American employee direct report and, upon departure, she had two).

Overall, then, even if this Court assumes *arguendo* that Ms. Grinnage-Pulley established a *prima facie* case of failure to hire her for the Acting Director of Instruction role, she has adduced no evidence that Ms. Highsmith's stated reason of bringing in her own trusted team of leaders constitutes pretext for age, race, or gender discrimination. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]e must keep in mind that Title VII is not a vehicle for

substituting the judgment of a court for that of the employer. Particularly, this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.") (internal quotations and citations omitted); *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722-23 (4th Cir. 2002) ("At the end, the burden remains on [plaintiff] to demonstrate that the reasons offered by the school board are a pretext for discrimination, or stated differently, that the school board's reason is unworthy of credence to the extent that it will permit the trier of fact to infer the ultimate fact of intentional discrimination.") (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000)). Accordingly, summary judgment is appropriate on Ms. Grinnage-Pulley's failure to hire claims under Title VII and the ADEA.

### B. Discriminatory Transfer/Constructive Discharge

Ms. Grinnage-Pulley's other claims under the ADEA and Title VII relate to Defendant's decision to transfer her from the Executive Team to the position of principal of Mill Creek Middle School. To establish a *prima facie* case of employment discrimination under either statute, Ms. Grinnage-Pulley has to show that (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations at the time of the adverse employment action; (3) she suffered an adverse employment action; and (4) that her employer treated similarly situated employees outside her protected class more favorably. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002) (allowing the fourth element, for an ADEA claim, to be satisfied by "proof of replacement by a substantially younger worker").

Here, the parties do not contest the first two factors, and agree that Ms. Grinnage-Pulley is a member of several protected classes, and performed satisfactorily or better throughout her

employment. Defendant argues, under the third factor, that Ms. Grinnage-Pulley's transfer did not constitute an adverse employment action. I disagree. The Fourth Circuit has determined that "reassignment with significantly different responsibilities" can constitute an adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). Without question, the responsibilities of a school principal diverge greatly from those of a central office administrator charged with supervising the school principals throughout the school system. Given the marked change in duties, and the shift from supervising principals to being one of the principals supervised, "a reasonable person in the plaintiff's position" could reasonably conclude that the transfer was materially adverse, without any reference to the change in commute or the anticipated future decrease in salary. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006).

Ms. Grinnage-Pulley's claims, then, turn on her ability to satisfy the fourth element of the *prima facie* case and her ability to show that Defendant's legitimate nondiscriminatory reason for her transfer was pretextual. Looking first to age discrimination in violation of the ADEA, Ms. Grinnage-Pulley has to demonstrate the fourth element of a *prima facie* case: that her employer treated similarly situated employees outside her protected class more favorably. Plaintiff has adduced no evidence of the ages of the persons who filled the Executive Team level positions after the restructuring, and thus cannot meet the fourth element of the analysis. Her only age-related argument is that Ms. McCourt, the younger Chief Budget and Business Officer, was allowed to maintain her job title while the other (somewhat older) Executive Team members were removed from their positions. First, however, it is unclear whether Ms. McCourt constitutes a "similarly situated" employee. Although both women were members of the Executive Team, one performed a technical financial function while the other focused on

14

educational administration. Where a plaintiff relies "upon a comparison to an employee from a non-protected class, . . . the validity of their prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). A showing that employees are similarly situated includes evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (alterations in original). First, the substantive differences in the type of work performed by Ms. McCourt and Ms. Grinnage-Pulley meant that their performance could not be measured by the same standards, and replacing Ms. McCourt would require a person with specialized financial knowledge, not a general background in educational administration. Second, the limited evidence adduced regarding Ms. McCourt demonstrates that she, like the other Executive Team members, was removed from the Executive Team and demoted on the organizational chart by Ms. Highsmith. *Compare* ECF 25-8 *with* ECF 25-9. Thus, Ms. Grinnage-Pulley has not established that "her employer treated similarly situated employees outside her protected class more favorably."

Moreover, Ms. Grinnage-Pulley's contention that Ms. McCourt received more favorable treatment undermines her suggestion that the reassignments discriminated against her on the basis of her gender. Additionally, a female Assistant Superintendent was selected for one of the two positions to replace the former Executive Team members, further hindering Ms. Grinnage-Pulley's ability to mount a *prima facie* case of gender discrimination.

As to race discrimination, assuming *arguendo* that Ms. Grinnage-Pulley established a *prima facie* case based on her transfer to a more geographically distant location than similarly situated white candidates who were transferred from the Executive Team, she is unable to establish the required pretext to sustain her claim. Ms. Highsmith proffered legitimate non-discriminatory reasons for her decisions to transfer the former Executive Team members to their respective positions: Ms. Roof already held the second position of Director of Student Services (in addition to Executive Director of Administration), so she did not require a transfer. ECF 26-6 at 8:11-15; 33:13-20. Of the two candidates who were transferred to school-level administrative positions, one, Ms. Welsh, had extensive special education experience, and the other, Ms. Grinnage-Pulley, had experience as a successful principal at a middle school. ECF 26-5 at 40:15-41:1; 73:5-16. Given that the two vacant positions existed at one special education school and one middle school, the decision to allot the two candidates in accordance with their prior experience is logical. Ms. Grinnage-Pulley offers no facts or evidence to suggest that the proffered rationale was pretextual.

Finally, although she concedes that it "is not the primary focus" of her claims, ECF 26 at 22, Ms. Grinnage-Pulley contends that the transfer decision amounted to constructive discharge. To establish constructive discharge, an employee must "show both intolerable working conditions and a deliberate effort by the employer to force the employee to quit." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993). "Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). However, "mere '[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions'" is not sufficient to establish constructive discharge. *James v. Booz-Allen & Hamilton, Inc.*, 368

F.3d 371, 378 (4th Cir. 2004) (alteration in original) (quoting *Carter*, 33 F.3d at 459). The transfer in this case, while amounting to an adverse employment action, did not give rise to "intolerable working conditions," and did not serve as "essentially a career-ending action or a harbinger of dismissal." Ms. Grinnage-Pulley was transferred to be the principal of a middle school, a position she had successfully held in the past. While Ms. Grinnage-Pulley unquestionably did not wish to make that change at that particular point in her career in educational administration, her disappointment in the leadership decisions made by Ms. Highsmith did not render her working conditions as middle school principal "intolerable." Additionally, even viewed collectively, the prospective pay reduction after the first year of the transfer, and the addition of 19 miles to Ms. Grinnage-Pulley's commute, do not rise to the level of "intolerable working conditions." Accordingly, even viewing all facts and drawing all inferences in the light most favorable to Ms. Grinnage-Pulley, summary judgment is appropriate.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 25, is GRANTED.

A separate Order is filed herewith.

Dated: June 21, 2019

/s/
Stephanie A. Gallagher
United States Magistrate Judge